**LEWIS–HALE COAL CO., Inc., v. ENTERPRISE FUEL CO.**

Circuit Court of Appeals, Fourth Circuit. July 1, 1929.

No. 2835.

Connor Hall, of Huntington, W. Va., for appellant.

Francis Key Murray, of Baltimore, Md. (C. N. Davis, of Huntington, W. Va., Karr & Colgan, of Baltimore, Md., and Fitzpatrick, Brown & Davis, of Huntington, W. Va., on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. Enterprise Fuel Company, a Maryland corporation, brought a suit in assumpsit against Lewis-Hale Coal Company, a West Virginia corporation, in the District Court of the United States for the Southern District of West Virginia, to recover the sum of $9,925 upon an account for coal sold and delivered by the plaintiff to the defendant. The indebtedness was not disputed, but an issue was raised by a counterclaim of the defendant based upon a contract between the parties which it was alleged the plaintiff had broken with resulting damage to the defendant in the sum of $15,000. The contract was made on or about September 3, 1927, through an interchange of letters. Thereby Enterprise Fuel Company, as principal, granted to Lewis-Hale Coal Company the exclusive selling agency in the territory east and south of the state of Indiana, except the state of Maryland, for anthracite coal of the Great Valley Anthracite Corporation produced at its mine at McCoy, Va. The agreement was to be effective from the date thereof to July 1, 1928; but the agent was given the option of renewing the agreement "upon the expiration of same, for a further period of five years." The agent's commission was fixed at 8 per cent. of the invoice price of the merchandise. The principal agreed to extend credit to the agent to the extent of $20,000. As a matter of fact, credit was extended and allowances for advertising expense were made; so that when differences between the parties arose, the sum total of the indebtedness of the selling agent was the sum for which suit was brought by the plaintiff. It was further provided in the agreement that the prices at which the coal was to be sold should be fixed by the principal as established by the Great Valley Anthracite Corporation. On its part the selling agent agreed to push the sale of the coal at all times in the territory described.

Lewis-Hale Coal Company had its principal office in Huntington, W. Va., and branch offices in Chicago and Detroit. After the contract was executed, it also opened an office in Washington and placed samples of the coal in the hands of its salesmen throughout the territory. The manager of the Washington office made a number of trips in an endeavor to sell the coal; but the only persistent effort was made in that city and practically no coal was sold elsewhere. The coal was not well known to the trade, and it was thought desirable to introduce it first in territory served at a low freight rate from the Virginia mine with the hope that, if it was found possible to sell it in direct competition with Pennsylvania anthracite, it would be easier to sell it elsewhere. The Washington office was kept open from September 1, 1927, to May 1, 1928. The expenses for the period were $11,541.71, and the total commissions on the coal sold were $2,361.41, so that the agent suffered a loss for the period of $9,-180.30. Its efforts met with little success between September 1, 1927, and January 1, 1928, but the sales gradually increased from January 1 to March 1, 1928. The month of April, 1928, was the first month in which there was no loss, the receipts and office expenses being about even. During May and June, as we shall see, the agent made no attempt to sell the goods. Nevertheless its Washington manager testified that in view of the progress which had been made, he believed that the agent could have sold between 40,000 and 60,000 tons of coal in Washington in the ensuing year if contractual relations between the parties had been maintained. He relied upon a yearly consumption of 620,000 tons of Pennsylvania anthracite in Washington at a price 25 per cent. in excess of the Virginia coal covered by the contract.

The circumstances which brought about the suit arose in this wise: On or about January 1, 1928, the agent succeeded in getting the American Ice Company a large wholesale dealer in coal in the city of Washington, to take an interest in the product of the Great Valley mine; and it was arranged by the agent that all sales in the city of Washington would be made through the ice company so that it would be able to make a profit on all of the shipments. When April arrived, the selling agent felt somewhat encouraged at the prospects of a market for the product. On April 7 it was notified by the Enterprise Fuel Company of a material advance in prices, averaging 35 or 40 per cent. increase. It appears that during the whole period of the contract, the mine was busy only one-half of the time and some increase in sales was necessary to insure its operation. The agent,

however, protested the increase, and on April 20 the prices were reduced to the former level. About this time, however, the agent discovered that the Great Valley Anthracite Corporation was itself negotiating with the American Ice Company and shipping goods to it direct. The Enterprise Fuel Company was immediately notified, and a meeting was held between representatives of both parties to the contract and of the mine. It was then agreed by all parties that no coal should be shipped to the American Ice Company up to July 1, 1928, the date of the expiration of the contract, except through the agent. Nevertheless direct shipments to the ice company continued. In all, 14 cars were delivered between April 1 and July 1. It is not charged that the Enterprise Fuel Company was party to these transactions, and it would seem that it was in no way to blame therefor. But the agent felt justified in suspending its activities, and on or about May 1, 1928, closed its Washington office and made no further effort to sell the coal. On May 7, the Enterprise Fuel Company, at that time a creditor of the agent in the sum of $9,925, notified the agent that it would be allowed credit for all shipments made by the mine to the American Ice Company up until the expiration of the contract on July 1, 1928, and pointed out that the transactions between the mine and the ice company did not bar the agent from selling any one else in Washington or prevent it from working in any other direction under the contract. The agent, however, refused to accept the commissions on the coal sold direct to the ice company and by letter of May 16, 1928, to the Enterprise Fuel Company, stated that it had abandoned all efforts to sell the coal until it should be assured by the mine owner that it intended to live up to the contract. In the meantime the agent announced that it would withhold the funds due by it as an offset against its loss and damage under the contract. On July 2, 1928, after the expiration of the contract, the agent wrote to the Enterprise Fuel Company that it elected to renew the contract for a period of five years from July 1, 1928, in accordance with the option. In response the fuel company replied that it would not accept a renewal of the contract for the reason that the Lewis-Hale Coal Company had not complied with the terms of the original agreement.

When the case came on for trial upon these facts the District Judge, at the conclusion of all the evidence, directed a verdict for the Enterprise Fuel Company, the plaintiff in the action, for the sum of $9,641, representing the full amount of its claim of $9,925, less the sum of $284, the amount of the commission at 8 per cent. on the 14 cars shipped directly from the mine to the American Ice Company in Washington during May and June. In other words, the District Court held that the agent was entitled to recover on its counterclaim full commissions on all sales made in the territory covered by the contract whether handled by it or not, but was entitled to no further damages. The only question in the case is whether this ruling was correct, or whether, as the agent claims, there was evidence of other damages suffered by it which should have been submitted to the jury for its determination.

The agent's claim for damages may be considered, first, with reference to the period of the original contract which expired July 1, 1928, and, second, with reference to the period of renewal of five years from that date. So far as the first period is concerned, it is clear that the agent suffered no recoverable loss other than that for which it was compensated in the verdict directed by the court. The expenses of its Washington office were, of course, incurred at its own risk. The only breach of contract was that involved in the direct sales to the ice company for which the proper measure of damages was applied, when credit for these sales was allowed as if they had been made by the agent itself. Bredemeier v. Pacific Supply Co., 64 Or. 576, 131 P. 312; Harter Medicine Co. v. Hopkins, 83 Wis. 309, 53 N. W. 501; Cofield v. Jenkins Motor Co., 89 S. C. 419, 71 S. E. 969; Eastern Motor Sales v. Apperson-Lee, etc., Co., 117 Va. 495, 85 S. E. 479. It cannot be fairly said that the shipment made by the mine to the ice company restricted the opportunity of the agent to make sale to any other person in the allotted territory. The Washington office was closed on May 1 by the agent of its own free will and without compulsion from the mine owner or the Enterprise Fuel Company; and the evidence indicates that the interruption of the work resulted in a saving rather than a loss to the agent, for the months of May and June are admitted to be the dullest of the year for the sale of coal, and it is not reasonable to conclude from the evidence in the case that if the agent had kept its office open and its organization intact during this period, a profit would have been made.

The evidence of loss suffered by the agent during the period following July 1, 1298, is so slight as to be hardly worthy of notice. It is in fact confined to the commissions on six cars delivered to the ice company in July. The agent contends that the loss is

far greater and that the jury should have been allowed to estimate how much business would have been done by the agent during the five years' period and what profit it would have made. The difficulties of reaching an exact figure are admitted, but the general rule is invoked that where the cause and existence of damages have been established with sufficient certainty, recovery will not be denied because they are difficult of ascertainment. Calkins v. Woolworth Co. (C. C. A.) 27 F. (2d) 314, 320; Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 209, 4 N. E. 264, 54 Am. Rep. 676. We think the rule is sound, but it is of no avail to this appellant because, with the trivial exception mentioned, the evidence fails to show the agent suffered a loss from the refusal of the principal to renew the contract. Bearing in mind that during most of the time the Washington office had been conducted at a substantial loss, and at no time at a profit, we do not attribute probative force to the opinion of the agent's Washington manager as to the sales which would have been made had the agency continued.

Moreover, the appellant's position is untenable for another reason. The evidence shows that the contract expired on July 1. The appellant claims that it did not abandon the contract on May 1, 1928, but merely suspended operations pending the improper direct sales by the mine to the ice company; and that the notice of renewal mailed on July 2 was a reasonable compliance with the provisions of a contract which did not expressly specify when the option should be exercised. As we have seen, the contract was to run from the date thereof to July 1, 1928, with the option to the selling agent to renew it upon its expiration for the further period of five years. It seems to be settled that time is of the essence in a contract of option, Williston on Contracts, § 853; and that if a contract gives an option for renewal at its expiration for an additional period without fixing the time when the option shall be exercised, the time for giving notice of renewal does not extend beyond the last day of the original term. Monmouth County Electric Co. v. Consolidated Gas Co., 83 N. J. Law, 531, 83 A. 900; Brown Method Co. v. Ginsberg, 153 Md. 414, 138 A. 402; Rutledge & Taylor Coal Co. v. Mermod, 209 Mo. App. 292, 237 S. W. 849. It is true that in the case at bar only a short period had elapsed between the expiration of the contract and the notice of renewal, but, as was said by Bond, C. J., in Brown Method Co. v. Ginsberg, supra: "The difference of one day in the giving of notice is small, in one view, but it is the distance across a necessary boundary in relations under the contract, and must be taken as decisive, or there can be no contract." We think that the letter of the Enterprise Fuel Company of July 5 refusing to accept a renewal on the ground that the agent had not complied with the terms of the agreement was justified.

The judgment of the District Court is affirmed.